UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

————

ROBERT LANGFORD,

                 Petitioner,                 Case No. 1:12-cv-311

v.                                   Honorable Gordon J. Quist

PAUL KLEE,

                 Respondent.

_____/

## REPORT AND RECOMMENDATION

      This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Following a jury trial in the Kent County Circuit Court, Petitioner was convicted of carrying a weapon with unlawful intent, MICH. COMP. LAWS § 750.226, carrying a concealed weapon, MICH. COMP. LAWS § 750.227, assault with a dangerous weapon (felonious assault), MICH. COMP. LAWS § 750.82, assault with intent to commit great bodily harm less than murder (GBH), MICH. COMP. LAWS § 750.84, and of being a fourth offense habitual offender, MICH. COMP. LAWS § 769.12. On December 30, 2008, Petitioner was sentenced, applying the fourth-felony-offender enhancement, to prison terms of 5 to 25 years each for the carrying and carrying-concealed convictions, 4 to 15 years for the felonious-assault conviction, and 10 to 50 years for the GBH conviction. In his *pro se* petition, Petitioner raises nine grounds for relief,[1] as follows:

      I.      The trial court erroneously failed to instruct the jury on the use of non-deadly force in self-defense.

---

[1]Petitioner formally numbered his claims as Grounds I to IV. Ground IV, however, contains six different claims, all of which were presented in Petitioner's pro per supplemental brief in the Michigan Court of Appeals. I have listed each claim separately.

II.      The prosecutor engaged in misconduct by improperly shifting the burden of proof onto him during rebuttal argument.

III.     Defense counsel rendered ineffective assistance by failing to object to the foregoing alleged instructional error and prosecutorial misconduct claim.

IV.     Ineffective assistance of defense counsel for failing to raise an insanity defense.

V.     The trial court improperly denied a challenge for cause.

VI.     Insufficiency of evidence.

VII.     The trial court failed to provide a correct jury instruction on the offense of carrying a concealed weapon with unlawful intent.

VIII.     Offense variable OV 4 was improperly scored.

IX.     The trial court [c]om[m]itted numerous sentencing errors with respect to the imposition of his sentence.

(Am. Pet., docket #22, Page ID##295-98.)  Respondent has filed an answer to the petition (docket #30) stating that the grounds should be denied because they are noncognizable, procedurally defaulted, or without merit.  Upon review and applying the AEDPA standards, I find that all of Petitioner's claims are either noncognizable or without merit.  Accordingly, I recommend that the petition be denied.

## **<u>Procedural History</u>**

### **A.    Trial Court Proceedings**

The state prosecution arose from Petitioner's use of a box cutter to slash two men in January 2008.  Petitioner was charged with the four primary offenses for which he was convicted.  Following a preliminary examination held on January 16, 2008, he was bound over on all charges.  A supplemental information was filed charging petitioner as a habitual offender, fourth offense, and he was arraigned in the Kent County Circuit Court on all five charges on February 8, 2008.

On March 11, 2008, the trial court ordered that Petitioner undergo competency and criminal-responsibility examinations.  At a hearing held on June 27, 2008, the court found Petitioner to be competent, based on the undisputed evidence from the psychiatric examiner.  The court then considered defense counsel's motion to withdraw as counsel because of a breakdown in the attorney-client relationship.  The court granted the motion.  While Petitioner expressed a desire to represent himself, the court indicated that it would first appoint substitute counsel and then consider Petitioner's request to represent himself, if Petitioner continued to wish to do so.  (6/27/08 Competency Hr'g Tr. at 9-10, docket #35.)

New counsel was appointed and appeared at a status conference on July 30, 2008.  At that hearing, Petitioner rejected a plea offer.  (7/30/08 Status Hr'g Tr. at 5, docket #36.)  Petitioner also expressed his interest in representing himself, but he requested some time to sit down with his new attorney and go over some important factors.  The court cautioned Plaintiff about the risks of self-representation, set the matter for trial, and indicated that, if Petitioner still wished to represent himself after his discussions with his attorney, the court would grant his request.  (*Id.* at 6-8.)

On September 12, 2008, the court heard and granted the second attorney's motion to withdraw as counsel.  Believing that Petitioner needed a legal advisor, even if he decided to represent himself in the courtroom, the court advised Plaintiff that he would appoint one more attorney to consult with Petitioner and then allow Petitioner to represent himself.  (9/12/12 Mot. to Withdraw Hr'g Tr. at 5-8, docket #37.)

Petitioner was tried before a jury beginning November 3, 2008, and concluding on November 6, 2008.[2] On the first morning of trial, Petitioner agreed to allow his attorney to represent him, after the court offered to issue any necessary subpoenas required by Petitioner. (Tr. I at 4-6.) Following jury selection, defense counsel moved to dismiss on the grounds that Petitioner had been deprived of his right to a speedy trial under the United States and Michigan Constitutions and Michigan Court Rule 6.004. (Tr. II at 5-6.) The court denied the motion. (*Id.* at 9-10.)

Michael Ross testified that, on January 5, 2008, he had been living at Mel Trotter Ministries for three or four weeks. At about 6:30 p.m., Ross had come to Mel Trotter to get dinner and stay overnight. He got in line for the meal, and he planned to attend chapel in order to be able to spend the night. He walked in front of Petitioner, who asked him for a cigarette. Petitioner smelled of alcohol. Ross testified that he told Petitioner that he could not afford to give him one, as he only had five or six left and he was not doing well financially. (*Id.* at 40-42, 46-47.) Petitioner's demeanor changed drastically, and he stated, "That's how niggers are, you know, they never want to help somebody . . . ." (*Id.* at 47, 49.) Ross exchanged angry words with Petitioner, but he then turned to walk away, because he did not want to have an argument that caused him to lose his bed that night. (*Id.* at 42, 47-48.) According to Ross, fighting would get men barred from Mel Trotter for 60 days. (*Id.* at 63.) After Ross turned away from Petitioner, he felt something fall over his right shoulder, some pressure, and he realized that Petitioner had cut him, causing him to bleed badly. Ross turned to look and saw Petitioner holding a yellow or green box cutter in his

---

[2]The Court will reference trial transcripts as follows:
Transcript for Nov. 3, 2008 (docket #48): Tr. I at ___;
Transcript for Nov. 4, 2008 (docket #39): Tr. II at ___;
Transcript for Nov. 5, 2008 (docket #40): Tr. III at ___; and
Transcript for Nov. 6, 2008 (docket #41): Tr. IV at ___.

hand.  Ross felt very threatened and decided to put some distance between himself and Petitioner, running around the side of a van.  (*Id.* at 42, 48, 53, 90.)  Ross denied having had anything to drink and having used drugs.  (*Id.* at 46.)

Petitioner turned right at Ionia Avenue and began to walk toward the Van Andel Arena.  Ross followed at a distance, calling out to Petitioner and saying that he was going to follow Petitioner until he saw a police officer, because Petitioner had cut him for no reason.  (*Id.* at 53.) When they passed Cherry Street, Ross saw a police officer on Division.  Ross ran toward the police car, and Petitioner turned in a different direction, heading toward an alley near Weston.  As Ross and the officer came up Weston Street, they saw Petitioner enter the Weston Apartments.  Ross pointed Petitioner out to the officer.  The officer jumped out of the police car with a gun in his hand and subsequently entered the building.  Ross remained in the police car and did not see what happened in the building.  (*Id.* at 54-56.)

The officer came out of the building, and Ross was let out of the police car to be treated by the medics who had arrived.  After five or ten minutes, Petitioner walked out of the building.  Ross pointed Petitioner out to the police, and Petitioner was arrested.  (*Id.* at 56-57.)  Ross was taken by ambulance to St. Mary's Hospital.  At the hospital, Ross was given a tetanus shot, and he received sixteen stitches, six under the skin and ten on top.  Ross was told that he would have a permanent scar.  (*Id.* at 59.)  According to Ross, the coat was sliced through and losing its stuffing. He last saw the coat on the hood of the police car.  (*Id.* at 60-61.)  Ross spent nine hours at the hospital, and he had to return because of shoulder problems, which kept him out of work for one-and-one-half months.  (*Id.* at 62-63.)  Ross denied having met or talked to Petitioner before the incident.  (*Id.* at 68.)

- 5 -

Casey James Fortune testified that he was homeless at the time of the incident and had been staying alternately at Guiding Light Mission and Mel Trotter.  (*Id.* at 100.)  On the evening of January 5, 2008, at approximately 6:30 p.m., he was waiting outside Mel Trotter for the time to get a bed for the night. He was standing on the Commerce Street side of the building.  (*Id.* at 100-01.)  Fortune was standing by himself, but other men were around.  Petitioner walked up to Fortune and asked him for a cigarette.  Fortune gave him one, and they talked for about 15 or 20 minutes.  (*Id.* at 102.)  Petitioner seemed all right, but a bit intoxicated.  (*Id.* at 103.)  As they were talking, Mr. Ross walked up, and he started conversing with Petitioner in an amiable fashion.  Their conversation escalated quickly, with Petitioner doing most of the talking and getting increasingly angered.  (*Id.* at 104-06.)  Petitioner said something about cigarettes or money, and Fortune had the impression that the two had talked earlier.  (*Id.* at 104.)  At the height of the argument, Petitioner turned slightly and caught Fortune in the hand with his arm.  Petitioner then reached for Ross, and the two began running toward Heartside Park. Fortune then noticed that his hand was bleeding, and he went inside to see the nurse.  Mel Trotter officials then contacted the police and an ambulance.  (*Id.* at 106-07.)  Fortune did not see Ross push Petitioner at any time.  (*Id.* at 111.)  Fortune testified that he did not see a weapon, but he felt something brush against his hand, which could only have come from Petitioner.  (*Id.* at 108-09.)  Fortune went to the emergency room and ended up receiving 14 stitches across the back of his hand.  (*Id.* at 110.)

John Brennan Bailey was a resident of Mel Trotter Ministries in January 2008.  He was working front desk security and receiving substance-abuse treatment.  As part of his job, he checked people in and out of the building, let people into chapel, and patrolled the grounds to prevent arguments.  (*Id.* at 119.)  Bailey testified that he had seen Fortune and Petitioner around the

shelter.  He had heard of Ross but did not know him personally.  (*Id.* at 120.) On January 5, 2008, at 6:30 p.m., he was letting men into the chapel for the service that starts at 7:15 in the winter.[3]  He was standing outside, manning the side door.  Shortly after the doors opened at 6:15, Petitioner, who was clearly intoxicated, came up to Bailey and asked what time he could come in.  Petitioner told him that he didn't want any trouble and wanted to come in and sleep.  Bailey told Petitioner that it wouldn't be a problem.  (*Id.* at 120, 128, 133.)  Petitioner walked down the sidewalk to the corner of the building, where Bailey believed he smoked a cigarette.  (*Id.* at 121.)  Things were going smoothly when he heard an argument.  He turned to see two men, Ross and Petitioner, pushing each other, though Petitioner was the most aggressive.  (*Id.* at 122, 126.)  Bailey heard Fortune telling the men to relax or they would not be able to stay at Mel Trotter that night.  (*Id.* at 125.)  He then saw Petitioner pull out a box cutter from his right pocket.  Ross ran away, and Petitioner slashed at Ross' back and shoulder.  Bailey saw Fortune jump in between the two and get slashed during the second swing.  Fortune came to Bailey with his hand bleeding, and Bailey called his supervisor.  (*Id.* at 122-23, 125, 127.)  According to Bailey, the incident happened quickly.  (*Id.* at 124.)  Bailey and his supervisor walked down to the corner of Division and Weston, and Bailey identified Petitioner, who had already been placed in custody.  (*Id.* at 127-28.)  According to Bailey, recording surveillance cameras were stationed both inside and outside the building, with one located outside both the front and side doors.  (*Id.* at 134-36.)  Bailey had no responsibility for or knowledge of the security tapes.  (*Id.* at 145.)

---

[3]Bailey testified that dinner was served on the other side of the building from where he was stationed at the time of the incident. (*Id.* at 132.)  The side door that he monitored was opened at 6:45 p.m. for chapel at 7:15 p.m., but, on cold nights, the supervisor would authorize an earlier opening time, as early as 6:00 p.m. (*See* Tr. II at 133.)  The doors are locked during chapel.  (*Id.* at 131.)

Grand Rapids Police Officer Gene Tobin testified that, just after he started his shift at 6:30 p.m., he received a call about an incident at Mel Trotter involving a man who was cut.  (*Id.* at 148-49.)  Near the intersection of Cherry and Division, he heard someone yelling frantically.  He rolled his window down and saw a man flagging him down.  The man told him that another man had stabbed him and that the man was going down the alley near him.  (*Id.* at 149-50.)  Tobin placed the man in the back of his cruiser and drove down the alley from Cherry, northbound.  Tobin got a good look at the man when he reached the end of the alley, where it runs right into 21 Weston, the Weston Apartments.  (*Id.* at 151.)  He saw the man running into the apartment complex, and Ross identified the man.  Tobin called out on the radio that he had the suspect running into 21 Weston.  He got out of his cruiser to give chase, but he could not get into the building until someone answered the buzzer.  He could see the man run down the hallway toward the elevators.  (*Id.* at 151-52.)  Eventually someone buzzed Tobin into the building, by which time Officers Butler and Cutright had joined him.  (*Id.* at 152.)  They went down the hall to where Tobin had seen the man run.  (*Id.*)  Tobin saw that one of the elevators was at the fifth floor, and he determined that that would be a good place to start.  They rode the elevator to the fifth floor, but they did not locate the man.  The officers then returned to the main floor to see if they could locate security or view the camera surveillance tapes.  Tobin went to tend to Ross until the paramedics arrived.  Ross was bleeding heavily from the back of his right shoulder, and his coat was soaked with blood.  Tobin had Ross keep direct pressure on the wound.  (*Id.* at 157.)  Tobin took a picture and then examined the coat.  He then removed the coat so that he could use it to apply direct pressure to the wound.  He looked over the entire jacket, but found no damage other than where the injuring slash had occurred. The jacket went with Ross in the ambulance.  (*Id.* at 157-58.)   While they were waiting in the cruiser

for the ambulance to arrive, Ross stated, "Hey, there's the guy, that's the guy that stabbed me right there." (*Id.* at 159.) Tobin yelled to Officers Cutright and Butler, identifying him as the suspect and telling them to "grab him." (*Id.*) Cutright and Butler placed the man in handcuffs. Tobin identified the man as Petitioner (*Id.* at 159-60.) Tobin placed Ross into the ambulance. He then put Petitioner in the cruiser and informed him of his rights. He told Petitioner that Ross had identified him as the man who stabbed him, and he advised that he himself had seen him run into the building and back out. (*Id.* at 160.) Petitioner initially denied any involvement in the incident. (*Id.* at 162.) Petitioner then told Tobin that he had gotten out of jail on December 27, 2007, and that he did not know anyone in the apartment building, but that he had caught the door when it was open. (*Id.* at 160.) Petitioner also stated that he had been talking to Ross, had gotten into an argument, and had pushed Ross. Ross had pushed him back, causing him to strike his head against a building. At that point Petitioner took out the box cutter and cut Ross on the shoulder. (*Id.* at 161.) When Tobin told Petitioner that he also had cut Fortune while Fortune was breaking up the fight, Petitioner stated, "Well, I apologize." (*Id.* at 162.) Petitioner was agitated when he first was placed in the cruiser, but after he calmed down, he was cooperative, though he seemed very intoxicated. (*Id.* at 163.) Together with Officers Butler and Cutright, Tobin searched the apartment building. Officer Butler located a yellow box cutter on the fourth floor near the elevator, and Tobin photographed it. (*Id.* at 164.) When he was searched at the jail, Petitioner had no cigarettes on his person. (*Id.* at 168.)

Officer James Butler testified substantially consistently with Officer Tobin regarding his arrival at the scene. (Tr. III at 4-6.) Because of the number of incidents that occur at 21 Weston, Butler was familiar with building security. He contacted Charlie Long, the head of building security. Long showed him video footage of Petitioner's movements, determining that Petitioner

had gotten off the elevator at the fourth floor.  Officer Butler and Officer Brent Stuart went to the fourth floor to search for evidence.  About fifteen feet from the door is a set of double doors that can be closed to shut off the hallway.  The doors were open, so there was a gap between the door and the open hallway.  Behind the door on the left, they located a yellow box cutter.  (*Id.* at 7-8.) Knowing that Tobin had a camera, they called him to take a photo and collect the evidence.  (*Id.* at 8.)

Charles Long, the building supervisor at 21 Weston, was passing by the building when he noticed a police cruiser.  He asked the officers about the problem, and they requested that he review the motion-activated video footage to determine where the man they described had gone. (*Id.* at 13-15.)  Long observed the man get on the elevator, get off the elevator at the fourth floor, get back on, and exit at the ground floor.  (*Id.* at 16-17, 21.)  When the man got off the elevator at the fourth floor, he stuck his head around one of the corner, but he did not actually go down any of the long hallways.  (*Id.* at 23-24.)  The video-camera does not pick up movement unless the person goes about ten steps down the long hallway, so the next camera did not contain footage of Petitioner. (*Id.* at 23-24, 29.)

Grand Rapids Police Detective John Purlee testified that he became involved in the case on the morning of January 6, 2008.  (*Id.* at 33.)  On that date, he obtained a buccal swab from Petitioner to be used for DNA matching against the box cutter.  (*Id.* at 35-36.)  Only a partial DNA sample was found on the box cutter, insufficient to exclude or include either Petitioner or any known person.  (*Id.* at 36-37.)  While Purlee was obtaining the buccal swab, Petitioner asked to see the court order and then stated, "I am not denying I did what I did."  (*Id.* at 39.)  Petitioner was asked no questions, but he volunteered that he had been shoved by a man twice and that he swiped at the man

and "hit him." (*Id.*)  He described his swiping motion as going from the man's left shoulder to his right hip. (*Id.* at 40.)  Detective Purlee indicated that he had inquired about whether video footage of the incident was available from the Mel Trotter outside cameras, but he learned that they were not. (*Id.* at 43.)

Petitioner testified that he was homeless on January 5, 2008.  He encountered Michael Ross that evening, a person he had met several times in 1994-96 and 1998 and had met since he became homeless shortly before the incident. (*Id.* at 57-58.)  Petitioner encountered Ross the night before, on January 4, 2008, at approximately 11:00 p.m.  Petitioner asked Ross to go to the store to purchase alcohol for Petitioner.  He told Ross to buy Paul Masson VSOP brandy, and he gave Ross eight dollars and ninety-some cents.  Petitioner claims that he had something else to do and did not want to walk to the store.  About a half-hour later, Ross returned. (*Id.* at 59-60.)  Petitioner opened the bag to reveal a bottle of E&J, a cheaper form of brandy that Petitioner does not drink.  Ross told Petitioner that they did not have what he wanted, and Petitioner told him that he should have brought back his money rather than substituting.  Petitioner then gave Ross the bottle because he did not drink it.  Ross told Petitioner that he had put three of his own dollars with Petitioner's money to buy it.  Petitioner gave him the three dollars and turned to leave.  Ross asked for more money, implying that he wanted to buy a rock of crack cocaine before he returned to the Guiding Light Mission.  Petitioner refused and again turned to leave.  Ross followed him, begging him. (*Id.* at 60-61.)  Petitioner told Ross that he could not do anything for him that night, but, if Ross asked him again on Saturday morning, he would see what he could do for him. (*Id.* at 61-62.)  Ross then left, and Petitioner went to Mel Trotter's.  The following day, at about 10:30 a.m., Petitioner saw Ross at the corner of Division and Williams.  Ross spoke with Petitioner's cousin

about three grams of cocaine Ross possessed.  Ross asked Petitioner where he should go to smoke his dope.  Petitioner told Ross that Ross had been out longer than Petitioner.  He advised Ross that, if Ross was going to use dope, he should sell some to make some money.  Petitioner then walked away and spent the rest of the day with his cousin, trying to stay warm.  (*Id.* at 63-64.)

Petitioner testified that he was looking for work.  He was promised some work at about 1:30 p.m. on Sunday with a man he had met on Saturday, helping with installing drywall and subfloors.  (*Id.* at 65-66.)  Because he thought he might be working, he went to a Family Dollar store at Buckley and Division to purchase a lime-green utility knife.  (*Id.* at 66.)  Petitioner testified that the box cutter recovered at 21 Commerce was not his; the one recovered was bright yellow, whereas his was dark lime green.  (*Id.* at 66-67.)  Petitioner took the utility knife out of the packaging and put it in the right front pocket of his pants.  (*Id.* at 67.)  He then went to God's Kitchen at 12:30 or 1:00 p.m., but he did not eat.  He spent the rest of the afternoon with his cousin and his cousin's Hispanic friend, going back and forth between Degage, Guiding Light, and God's Kitchen.  He was at Degage between 6:15 and 6:30, hoping that they would open early because of the cold, but they did not.  (*Id.* at 67-69.)  While he was waiting, Petitioner saw Mr. Ross, who was drinking and smoking with a couple of other men in a "cubby" in the front of the building on Division Avenue.  (*Id.* at 69.)  Petitioner avoided Ross, because Ross was known to be a pest.  (*Id.*)  Petitioner arrived at the Commerce Street entrance to Mel Trotter Ministries at 6:30.  He went to the door and asked someone who worked at the mission if he had enough time to smoke a cigarette before chapel.  According to Petitioner, that man was not John Bailey.  (*Id.* at 70-71.)  Petitioner had purchased some hand-rolled cigarettes, and he went to smoke one.  He walked over to a man to whom he had

previously talked and reached for his cigarette container.  The man was not Casey Fortune.  The man offered Petitioner one of his own cigarettes, and Petitioner accepted.  (*Id.* at 72-73.)

        After Petitioner had smoked about half of the cigarette and put it out, Ross walked over.  He demanded that Petitioner give him the money they had discussed the other night, but Petitioner refused.  (*Id.* at 77.)  Ross pushed Petitioner's head into the wall.  (*Id.* at 74.)  Petitioner started to go to his pocket for the utility knife and reconsidered.  He told Ross, "I'm gonna let you get away with this one, but if you put your hands on me again, I'm gonna fuck you up."  (*Id.* at 74-75.)  According to Petitioner, Ross pushed him again.  Petitioner pulled out the box cutter and slashed from Petitioner's right shoulder, downward.  Petitioner claims he sliced the front of Ross' jacket.  (*Id.* at 75.)  Ross did not back up.  Instead, he walked to his left into the vacant lot and tried to pick up what Petitioner believed was a piece of pipe.  Ross then came back, and Petitioner did not know what he had.  Petitioner grabbed the bag of clothes he had near him and began to get away, moving up Commerce Street to Cherry Street and then to Weston Street.  (*Id.* at 79-82.)  At Weston, he saw a man entering the Weston Apartments.  When the man saw the police chasing Petitioner, he said, "Old school, hurry up, come on."  (*Id.* at 82.)  Petitioner rain in the door as the man pulled it open.  Petitioner claimed to have remained in the building for an hour or an hour and one-half.  (*Id.*)  He thought the police had gone, but he found them waiting for him.  (*Id.* at 84.)  According to Petitioner, the utility knife was left in his bag of clothes in the apartment in which he had stayed.  (*Id.*)  Petitioner denied having cut Ross, saying he had only cut the front of Ross' jacket and had not cut Ross.  He acknowledged that he had apologized for injuring the other man, as he had not intended to and had not realized he had done so.  (*Id.* at 85.)

Petitioner was cross-examined about his criminal record involving dishonesty.  (*Id.* at 87.)  The prosecutor also inquired why Petitioner did not buy the brandy himself.  Petitioner claimed he was doing something with a friend, who he only knew by the name "Flavor."  The prosecutor inquired whether Flavor or Petitioner's cousin, Kenny McFarland, would corroborate parts of his story.  (*Id.* at 89-90.)  Petitioner told him, "No."  (*Id.* at 90.)  Petitioner also admitted having a few drinks, but he denied being intoxicated.  (*Id.* at 91.)  He also did not know the name of the man who offered him the drywalling job, though he had seen the man before at God's Kitchen and knew he did that kind of work.  (*Id.* at 92.)  Petitioner acknowledged that the man was not present in court to testify.  (*Id.* at 93.)  Petitioner denied cutting Ross or intending to hurt him.  He merely wanted Ross to back off.  (*Id.* at 100.)  Petitioner also refused to answer whose apartment he had gone into, but the number was either 430 or 403.  (*Id.* at 103-04.)

At the conclusion of trial, on November 6, 2008, the jury found Petitioner guilty of assault with intent to do great bodily harm less than murder, assault with a dangerous weapon, carrying a concealed weapon, and carrying a weapon with unlawful intent.  (Tr. IV at 56-59.)  On December 30, 2008, Petitioner was sentenced as a fourth felony offender to respective prison terms of 10 to 50 years, 4 to 15 years, 5 to 25 years, and 5 to 25 years.  (Sentencing Transcript, (S. Tr.) at 8, docket #42.)

## B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on May 28, 2009, raised the first three issues presented in this application for habeas corpus relief.  (*See* Def.-Appellant's Br. on Appeal, docket #43.)  Petitioner filed a pro per

- 14 -

brief on appeal on May 26, 2010, in which Petitioner raised the remaining six claims he presented

in his habeas application. (Supp. Br. on Appeal, docket #43.)  By unpublished opinion issued on

October 26, 2010, the Michigan Court of Appeals rejected all appellate arguments and affirmed

Petitioner's convictions and sentences.   (See 10/26/10 Mich. Ct. App. Opinion (MCOA Op.),

docket #43.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme

Court.  Petitioner raised the same nine claims raised before and rejected by the Michigan Court of

Appeals.  By order entered June 28, 2011, the Michigan Supreme Court denied his application for

leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See*

Mich. Ord., docket #44.)

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB.

L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The

AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect

to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has

"drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir.

2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant

to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits

in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved

an unreasonable application of, clearly established federal law as determined by the Supreme Court

of the United States; or (2) resulted in a decision that was based upon an unreasonable determination

of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).   In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Lopez v, Smith*, 135 S. Ct. 1, 4 (2014); *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 132 S. Ct. 38 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).  The court may grant relief under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case."  *Id.*  A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699.  Rather, the issue is whether the state court's application of clearly established federal law is "objectively

unreasonable." *Id.* at 410.  "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1706-07 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 784 (2011)).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

### I.    Procedural Default

Respondent contends that Grounds I, II, VII, VIII, and IX of the petition are procedurally defaulted, because Petitioner waived them or failed to timely object in the trial court. When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the state court

- 17 -

enforced the rule so as to bar the claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001). In determining whether a state procedural rule was applied to bar a claim, a reviewing court looks to the last reasoned state-court decision disposing of the claim. *See Ylst*, 501 U.S. at 803; *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

The United States Supreme Court has held, however, that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved

- 18 -

complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)). *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").  Where, as here, the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default.  *See Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).  As a consequence, I will proceed directly to the merits of each of Petitioner's claims.

II.     Jury Instructions – Grounds I & VII

In Ground I of his petition, Petitioner argues that the trial court violated his right to due process by instructing the jury on the use of deadly force, but failing to instruct the jury on the use of non-deadly force.  In Ground VII, Petitioner contends that the trial court violated his right to due process by failing to provide a correct jury instruction on the offense of carrying a concealed weapon with unlawful intent.  Also in his seventh ground, Petitioner argues that the trial court improperly failed to issue a missing-evidence instruction.

Typically, a claim that a trial court gave an improper jury instruction is not cognizable on habeas review.  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), "it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  *Id.* at 67-68.  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Id.* at 68; *see also* 28 U.S.C. § 2254(a).  Erroneous jury instructions may not serve as the basis for

habeas relief unless they have "so infused the trial with unfairness as to deny due process of law." *Id.* at 75; *see also Waddington v. Sarausad*, 555 U.S. 179, 191 (2009); *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977); *Rashad v. Lafler*, 675 F.3d 564, 569 (6th Cir. 2012); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).  If Petitioner fails to meet this burden, he fails to show that the jury instructions were contrary to federal law.  *Id.*

### A.    Non-Deadly Force Instruction

Petitioner argues that, in addition to the jury instruction on the use of deadly force, he was entitled to a jury instruction on the use of non-deadly force.  He asserts that the denial of the instruction violated his due process right to a fundamentally fair trial.

Reviewing for plain error, the Michigan Court of Appeals rejected Petitioner's argument that the failure to give the non-deadly-force instruction violated fundamental fairness:

> Although error plainly occurred in this instance, defendant is not entitled to relief because he has not demonstrated that the error substantially affected his rights. The testimony at trial was overwhelming that defendant did brandish the weapon. John Bailey, the eyewitness, testified that Ross started to flee from defendant after he brandished the box cutter, and that defendant slashed at Ross twice.  According to Bailey, defendant missed with the first attempt, but slashed Ross's neck or shoulder with the second attempt.  The testimony of Ross, the nature of his wounds and the admission of the defendant to the officers all supported the proposition that defendant appears to have used more force than necessary for self-defense in this case.  *See People v Kemp*, 202 Mich App 318, 322; 508 NW2d 184 (1993).  We conclude that defendant's conduct fits the definition of deadly force, where "defendant's acts are such that the natural, probable, and foreseeable consequence of said acts is death." *Pace*, 102 Mich App at 534.  Consequently, defendant has not established that the proper instruction would have resulted in a different outcome. As a result, the trial court's incomplete instruction to the jury on self-defense, though erroneous, did not affect defendant's substantial rights, [*People v*] *Aldrich*, 246 Mich App [101], 124-125 [(2001)].

(MCOA Op. at 2.)  Under Michigan law, relief for plain error affecting substantial rights requires a showing that the error resulted in the conviction of an actually innocent person or "'seriously

- 20 -

affect[ed] the fairness, integrity or public reputation of judicial proceedings' . . . ." *People v. Carines*, 597 N.W.2d 130, 138 (Mich. 1999) (citing *United States v. Olano*, 507 U.S. 725, 736-37 (1993) (addressing the plain-error rule of FED. R. CRIM. P. 52(b), as it implicates fundamental fairness under the Due Process Clause)). In other words, the standard requires consideration of whether the error violated a defendant's right to due process. *Id.*

The state-court's conclusion that the erroneous jury instruction did not render Petitioner's trial fundamentally unfair was an entirely reasonable application of federal constitutional law to the facts of the case. As the court of appeals discussed, the record evidence overwhelmingly supported the jury's findings. Petitioner admitted that he had a utility knife and that he slashed at Ross twice. He also admitted that he went to the fourth floor of 21 Weston, where the utility knife was found. Despite his claim that he had cigarettes in his possession, he had no cigarettes when he was searched. In addition, witness testimony, the seriousness of Ross' and Fortune's injuries, and the timing of the chase and arrest were all consistent with Petitioner's guilt, not with his own version of events. As a consequence, the state-court's decision that Petitioner was not deprived of fundamental fairness is neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts.

**B.      Instruction on Carrying a Dangerous Weapon with Unlawful Intent**

In his seventh ground for habeas relief, Petitioner argues that the trial court erred when it failed to give a missing-evidence instruction. He argues that the police failed to preserve the coat the victim was wearing, which he claims would have shown that he did not cut the victim, but only slashed the front of the coat.

- 21 -

The Michigan Court of Appeals held as follows:

> Fourth, defendant argues that the trial court erroneously failed to provide a correct jury instruction on the offense of carrying a dangerous weapon with unlawful intent, as well as failing to provide a missing evidence instruction.  This issue is waived, where defense counsel expressed satisfaction with the trial court's jury instructions.  *Carter*, 462 Mich at 216; Tate, 244 Mich App at 559.  Nevertheless, the record demonstrates that the trial court's jury instruction on the offense of carrying a dangerous weapon with unlawful intent was proper, where it included all of the elements of the charged offense.  *Canales*, 243 Mich App at 574.  Further, defendant was not entitled to a missing evidence instruction, where there is no evidence that the prosecution acted in bad faith in allegedly failing to produce evidence.  *See People v Davis*, 199 Mich App 502, 514-515; 503 NW2d 457 (1993). Defendant failed to establish plain error affecting his substantial rights.  *Aldrich*, 246 Mich App at 124-125.  Defendant's related claims of ineffective assistance of counsel are abandoned for failure to address the merits of such claims.  *People v McPherson*, 263 Mich App 124, 136; 687 NW2d 370 (2004).

(MCOA Op. at 4-5, docket #43.)  In other words, the court of appeals concluded that, under state law, Petitioner was not entitled to the instruction because the prosecutor did not deliberately suppress the evidence.

The state court's factual finding that the prosecutor did not suppress evidence is presumed by a habeas court to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656; *Sumner*, 449 U.S. at 546 (1981).  Petitioner makes no attempt to meet his burden, and the court's finding is wholly supported by the record.  Moreover, the state court's interpretation of its own law is not subject to habeas review.  *See Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) ("'[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'") (quoting *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005)); *see also Wainwright v. Goode*, 464 U.S. 78, 84 (1983).

Because there was no error under state law, the failure to give the missing-evidence instruction necessarily falls short of the level of a due process violation.

III.    Prosecutorial Misconduct During Rebuttal

In his second ground for habeas relief, Petitioner argues that the prosecutor committed misconduct by shifting the burden of proof to Petitioner during rebuttal argument.  In making this argument, Petitioner relies on the fact that the prosecutor asked the jury, "[D]id he prove any of his defense to you[?]"  (Tr. III at 12-13.)

In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).  In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental.  *See United States v. Young*, 470 U.S. 1, 11-12 (1985).  The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court.  *See id.* at 12-13;  *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

The Michigan Court of Appeals addressed the issue as follows:

Next, defendant claims that the prosecutor engaged in misconduct by improperly shifting the burden of proof onto him during the prosecutor's rebuttal

- 23 -

argument.  We review unpreserved claims of prosecutorial misconduct under the plain-error rule.  *People v Ackerman*, 257 Mich App 434, 448; 669 NW2d 818 (2003).  A prosecutor may not attempt to shift the burden of proof, *People v Abraham*, 256 Mich App 265, 272; 662 NW2d 836 (2003); however, "attacking the credibility of a theory advanced by a defendant does not shift the burden of proof." *People v McGhee*, 268 Mich App 600, 635; 709 NW2d 595 (2005).

Although the challenged portion of prosecutor's rebuttal includes language that questions whether defendant proved his defense to the jury ("did he prove any of his defense to you"), viewing the prosecutor's remarks in context, we find that the prosecutor was not attempting to shift the burden of proof onto defendant.  Rather, the prosecutor was arguing that defendant's story was not corroborated by any supporting evidence, and, therefore, was not worthy of belief. *People v Howard*, 226 Mich App 528, 548; 575 NW2d 16 (1997).  Further, the prosecutor properly responded to defendant's claims that he did not cause the injuries to the two victims. When a defense makes an issue legally relevant, the prosecutor may comment on the improbability of the defendant's theory or evidence. *People v Fields*, 450 Mich 94, 116; 538 NW2d 356 (1995).  Additionally, the prosecutor did not misstate the record by arguing that only defendant claimed that Ross was aggressor.  It is true that there was testimony that defendant and Ross engaged in pushing; however, there was no testimony, other than by defendant, that Ross was the aggressor.  We conclude that the prosecutor did not shift the burden of proof, where the remarks, taken in context, merely challenged the credibility of defendant as well as his defense theories. *McGhee*, 268 Mich App at 635; *Howard*, 226 Mich App at 548.

The trial court also instructed the jury at the conclusion of trial, in part, that the arguments of the attorneys did not comprise evidence, that the jurors must presume defendant's innocence, that they were only to consider the evidence admitted at trial, and that they were to decide which witnesses were credible, and that the prosecutor had the burden to prove the elements of each offense and to disprove defendant's claim of self-defense beyond a reasonable doubt.  The trial court's instructions prevented any potential prejudicial effect. *Ackerman*, 257 Mich App at 448-449.  Defendant, therefore, failed to establish plain error affecting his substantial rights. *People v Carines*, 460 Mich 750, 761-764; 597 NW2d 130 (1999).

(MCOA Op. at 2-3.)

The decision of the court of appeals is patently reasonable.  The prosecutor's statement, when read in context, does not support a finding that the prosecutor attempted to shift the burden of proof.  The prosecutor said, in relevant part:

- 24 -

[Defense counsel] is absolutely correct when she said that the defendant doesn't have to do anything at all. He doesn't have to prove his innocence. He has a right to remain silent. He did not have to get up on the stand and testify. I'll leave it to you to decide whether or not Mr. Langford made the right decision to get up on the stand yesterday.

He did try, when he took the stand he did try to offer evidence to you. He doesn't understand the difference between evidence and proof. Evidence is something that he presents to you to try to prove something, did he prove any of his defense to you. He offered you evidence, minimal evidence that is unsubstantiated by any corroborating evidence, by any witness testimony that he says would exist, that would l[e]nd any credence at all to his argument. It wasn't there.

He took the stand. He offered evidence. I have a right to address the weight of the evidence that he tried to prove something to you with.

The only person, the only evidence that Mr. Ross was the aggressor in this case comes from the defendant's mouth. No other witnesses, no other evidence shows that Mr. Ross was the aggressor in this case, none.

(Tr. III at 12–13.)

From this record, it is apparent that the prosecutor was arguing the credibility of Petitioner's testimony in the context of the other evidence. In context, the prosecutor's reference to whether Petitioner proved his defense cannot be interpreted as a shifting of the burden of proof. The prosecutor emphasized that Petitioner did not have to prove his innocence. He expressly told the jury that he was arguing the weight of Petitioner's evidence against the other evidence in the case. He immediately followed his brief reference with an acknowledgment that Petitioner's testimony was evidence. He simply argued that Petitioner's testimony was unsubstantiated by the testimony of any other witness or the physical facts of the case and therefore should not be believed.

Under these circumstances, the prosecutor's brief phrase was neither prejudicial nor fundamentally unfair in violation of due process. *See Darden*, 477 U.S. at 181. The state court's

rejection of Petitioner's claim therefore was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent.

IV.   Denial of Challenge for Cause

In his fifth habeas ground, Petitioner asserts that the trial court improperly denied one of his challenges for cause. Although Petitioner introduced his argument on appeal with descriptions of the Fifth and Ninth Amendments and the Fourteenth Amendment's Due Process and Equal Protection Clauses (Pet'r's Supp. Br. on Appeal at 15-18, docket #43), he argued his claim solely under state law, and the state court applied state law to deny Petitioner's claim:

> Second, defendant contends that the trial court improperly denied a challenge for cause on a prospective juror. Such a decision is reviewed for an abuse of discretion. *People v Eccles*, 260 Mich App 379, 382-383; 677 NW2d 76 (2004). Even if the trial court erred by not excusing the challenged juror, reversal is not warranted. In such cases where reversal is required, "[t]here must be a clear and independent showing on the record that (1) the court improperly denied a challenge for cause, (2) the aggrieved party exhausted all peremptory challenges, (3) the party demonstrated the desire to excuse another subsequently summoned juror, and (4) the juror whom the party wished later to excuse was objectionable." *People v Lee*, 212 Mich App 228, 248-249; 537 NW2d 233 (1995). The record demonstrates that the final three prongs are not satisfied in this case. The defense did not exhaust all peremptory challenges, where defense counsel exercised peremptory challenges on three jurors, including the challenged juror. *See* MCR 6.412(E)(1) (criminal defendants are generally entitled to five peremptory challenges). Further, there is no indication that the defense sought to excuse any further jurors, where defense counsel ultimately expressed satisfaction with the jury. Thus, reversal is not warranted. *Id.*

(MCOA Op. at 4.)

Habeas corpus lies only for a violation of the United States Constitution. 28 U.S.C. § 2254(a). The federal courts have no power to intervene on the basis of a perceived error of state law. *Wilson v. Corcoran*, 131 S. Ct. 13, 14 (2010); *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle*, 502 U.S. at 67-68; *Pulley v. Harris*, 465 U.S. 37, 41 (1984). The decision of the state courts

on a state-law issue is binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983). As a consequence, Petitioner is not entitled to relief in this Court on the basis of state rules on peremptory challenges.

Moreover, even had he properly raised a constitutional claim in the state courts or this Court, such a claim has repeatedly been rejected by the Supreme Court:

> "[I]f [a] defendant elects to cure [a trial judge's erroneous for-cause ruling] by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat . . . he has not been deprived of any . . . constitutional right. . . . [T]he "use [of] a peremptory challenge to effect an instantaneous cure of the error' exemplifies 'a principal reason for peremptories: to help secure the constitutional guarantee of trial by an impartial jury.'"

*Skilling v. United States*, 528 U.S. 359, 395 n.31 (quoting *United States v. Martinez–Salazar*, 528 U.S. 304, 307 (2000)). Petitioner does not and cannot allege that any biased juror sat on his jury. As the state court held, Petitioner used only three of his five peremptory challenges. He therefore had ample opportunity to eliminate any biased juror. Petitioner therefore has not and cannot raise an issue of constitutional dimension.

V.      Insufficiency of the Evidence

In his sixth habeas ground, Petitioner contends that the evidence was insufficient to support his conviction on the charge of carrying a weapon with unlawful intent, MICH. COMP. LAWS § 750.226. A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues

of credibility may not be reviewed by the habeas court under this standard.  *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993).   Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law.  *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The *Jackson v. Virginia* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Id*.  Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "'the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan [trial court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA.'"  *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)).

The statute provides as follows:

> Any person who, with intent to use the same unlawfully against the person of another, goes armed with a pistol or other firearm or dagger, dirk, razor, stiletto, or knife having a blade over 3 inches in length, or any other dangerous or deadly weapon or instrument, shall be guilty of a felony, punishable by imprisonment in the state prison for not more than 5 years or by a fine of not more than 2,500 dollars.

MICH. COMP. LAWS § 750.226.  Under Michigan law, the elements of the offense defined at Mich. Comp. Laws § 750.226 are the following:  "'(1) carrying a firearm or dangerous weapon, (2) with the intent to unlawfully use the weapon against another person."  *People v. Mitchell*, 825 N.W.2d 615, 621 (Mich. Ct. App. 2013) (quoting *People v. Harrington*, 487 N.W.2d 479, 483 (1992)).  Petitioner challenges only one element of the offense, arguing that the prosecution presented

insufficient evidence that he carried the box cutter with the requisite intent. He asserts that, to qualify under the statute, the jury was required to find that he intended to use the weapon unlawfully when he first possessed it.

Applying proper the federal standard, the Michigan Court of Appeals rejected his argument as follows:

> Third, defendant challenges the sufficiency of the evidence for his carrying a dangerous weapon with unlawful intent conviction. We review sufficiency of the evidence claims de novo, viewing the evidence in the light most favorable to the prosecution to determine if the evidence was sufficient for a rational jury to find the defendant guilty beyond a reasonable doubt. [*People*] *v. McGhee*, 268 Mich App [600,] 622[, 705 NW2d 595, 612] (2005). Defendant only challenges the element of intent. A defendant's intent can be proved by circumstantial evidence, "from his words or from the act, means, or the manner employed to commit the offense." *People v Hawkins*, 245 Mich App 439, 458; 628 NW2d 105 (2001).
>
> Here, the testimony of Bailey and Ross, as well as defendant's admission to the police, establishes the element of intent, where if believed by the jury, the testimony and admission demonstrates that defendant possessed a box cutter and intended to injure Ross with it by slashing at him with it. *Id.* This Court should not interfere with the jury's credibility assessment of the witnesses. *Williams*, 268 Mich App at 419. Defendant essentially contends that there must be evidence that defendant intended to use the dangerous weapon unlawfully when he first possessed it. The plain meaning of the statute precludes the use of a dangerous weapon against the person of another. *See* MCL 750.226. The fact that defendant may have had a legitimate use for the box cutter when he initially obtained it does not matter. There is no statutory requirement that he have unlawful intent when he initially obtained the dangerous weapon. Defendant's box cutter would fall under the statute as a "razor" or "any other dangerous weapon or instrument," and the evidence demonstrated that he intended to use the box cutter unlawfully, i.e., in an assaultive manner, against a retreating Ross. MCL 750.226. Viewing the evidence in the light most favorable to the prosecution, we conclude that there was sufficient evidence for a rational jury to find defendant guilty beyond a reasonable doubt of the offense of carrying a dangerous weapon with unlawful intent. *McGhee*, 268 Mich App at 622.

(MCOA Op. at 4, docket #43.)

As discussed earlier, "'a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas

- 29 -

corpus.'" *Stumpf*, 722 F.3d at 746 n.6 (quoting *Bradshaw*, 546 U.S. at 76).  Accordingly, under Michigan law, the jury was only required to find that Petitioner intended to use the box cutter unlawfully when he was attacking Ross.

The state court reasonably concluded that there was sufficient evidence for a jury to conclude that Petitioner possessed the requisite intent.  Numerous witnesses, including Petitioner, testified that Petitioner swept the box cutter at Ross, intending to use it as a weapon and cutting Ross' coat.  Though Petitioner argued self-defense and denied having actually cut either Ross or Fortune when he used the box cutter, the testimony of all other witnesses – as well as Ross and Fortune's serious injuries – amply supported the conclusion that Petitioner had the intent to use the box cutter as a weapon.

In sum, the state court's rejection of his claim was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

VI.    Sentencing Errors

Petitioner argues in Ground VIII of his petition that Offense Variable (OV) 4 was improperly scored, thereby depriving him of due process.  In Ground IX of the petition, Petitioner asserts that the sentencing court made numerous other sentencing errors, resulting cruel and unusual punishment under the Eighth Amendment and violating the due process and equal protection guarantees of the Fifth and Fourteenth Amendments.  With respect to both of his sentencing issues, Plaintiff also argues that the court made factual findings during the sentencing hearing that resulted in a violation of his Sixth Amendment right to a jury trial under *Blakely v. Washington*. 542 U.S. 296 (2004).

- 30 -

The court of appeals concluded that OV 4 had been improperly scored at 10 points. It held, however, that resentencing was not required, because the error did not affect the offense level at which Petitioner was sentenced. In other words, the scoring error had no affect on the sentence. (MCOA Op. at 5, docket #43.) In addition, the court of appeals found no other sentencing error that affected Petitioner's sentence. Finally, the court rejected Petitioner's *Blakely* claims, because *Blakely* is inapplicable to Michigan's indeterminate sentencing scheme. (*Id.*)

Again, "a federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" *Wilson*, 131 S. Ct. at 16 (quoting 28 U.S.C. § 2254(a)). The federal courts have no power to intervene on the basis of a perceived error of state law. *Wilson*, 131 S. Ct. at 14; *Bradshaw*, 546 U.S. at 76; *Estelle*, 502 U.S. at 67-68; *Pulley*, 465 U.S. at 41. Claims concerning the improper application of sentencing guidelines are state-law claims and typically are not cognizable in habeas corpus proceedings. *See Hutto v. Davis*, 454 U.S. 370, 373-74 (1982) (federal courts normally do not review a sentence for a term of years that falls within the limits prescribed by the state legislature); *Austin v. Jackson*, 213 F.3d 298, 301-02 (6th Cir. 2000) (alleged violation of state law with respect to sentencing is not subject to federal habeas relief).

To the extent Petitioner argues that his sentence was disproportionate under *People v. Milbourn*, 461 N.W.2d. 1 (Mich. 1990), he fails to raise a cognizable habeas claim. In *Milbourn*, the Michigan Supreme Court held that a sentencing court must exercise its discretion within the bounds of Michigan's legislatively prescribed sentence range and pursuant to the intent of Michigan's legislative scheme of dispensing punishment according to the nature of the offense and the background of the offender. *Milbourn*, 461 N.W.2d at 9-10; *People v. Babcock*, 666 N.W.2d

- 31 -

231, 236 (Mich. 2003).  It is plain that *Milbourn* was decided under state, not federal, principles.  *See Lunsford v. Hofbauer*, No. 94-2128, 1995 WL 236677, at * 2 (6th Cir. Apr. 21, 1995); *Atkins v. Overton*, 843 F. Supp. 258, 260 (E.D. Mich. 1994).  As previously discussed, a federal court may grant habeas relief solely on the basis of federal law and has no power to intervene on the basis of a perceived error of state law.  *See Wilson*, 131 S. Ct. at 14; *Bradshaw*, 546 U.S. at 76; *Pulley*, 465 U.S. at 41.  Thus, Petitioner's claim based on *Milbourn* is not cognizable in a habeas corpus action.

Moreover, Petitioner's claim that his sentence was disproportionate under the Eighth Amendment is without merit.  The United States Constitution does not require strict proportionality between a crime and its punishment.  *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991); *United States v. Marks*, 209 F.3d 577, 583 (6th Cir. 2000).  "Consequently, only an extreme disparity between crime and sentence offends the Eighth Amendment."  *Marks*, 209 F.3d at 583; *see also Lockyer v. Andrade*, 538 U.S. 63, 77 (2003) (gross disproportionality principle applies only in the extraordinary case); *Ewing v. California*, 538 U.S. 11, 36 (2003) (principle applies only in "'the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality'") (quoting *Rummel v. Estelle*, 445 U.S. 263, 285 (1980)).  A sentence that falls within the maximum penalty authorized by statute "generally does not constitute 'cruel and unusual punishment.'"  *Austin v. Jackson*, 213 F.3d 298, 302 (6th Cir. 2000) (quoting *United States v. Organek*, 65 F.3d 60, 62 (6th Cir. 1995)).  Further, "[f]ederal courts will not engage in a proportionality analysis except in cases where the penalty imposed is death or life in prison without possibility of parole."  *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995). Petitioner was not sentenced to death or life in prison without the possibility of parole, and his sentence falls

- 32 -

within the maximum penalty under state law.  Petitioner's sentence therefore does not present the extraordinary case that runs afoul of the Eighth Amendment's ban of cruel and unusual punishment.

Petitioner also fails to demonstrate a due process violation.  A sentence may violate due process if it is based upon material "misinformation of constitutional magnitude." *Roberts v. United States,* 445 U.S. 552, 556 (1980), *quoted in  Koras v. Robinson,* 123 F. App'x 207, 213 (6th Cir. 2005); *see also United States v. Tucker,* 404 U.S. 443, 447 (1972); *Townsend v. Burke,* 334 U.S. 736, 741 (1948).  To prevail on such a claim, the petitioner must show (1) that the information before the sentencing court was materially false, and (2) that the court relied on the false information in imposing the sentence. *Tucker,* 404 U.S. at 447; *United States v. Polselli,* 747 F.2d 356, 358 (6th Cir. 1984); *Koras,* 123 F. App'x at 213 (quoting *United States v. Stevens,* 851 F.2d 140, 143 (6th Cir. 1988)).  A sentencing court demonstrates actual reliance on misinformation when the court gives "explicit attention" to it, "found[s]" its sentence "at least in part" on it, or gives "specific consideration" to the information before imposing sentence. *Tucker*, 404 U.S. at 444, 447.

Petitioner does not identify any facts found by the court at sentencing that were either materially false or based on false information, with the exception of finding of psychological injury under OV 4, which had no affect on the sentence.  He therefore fails to demonstrate that his sentence violated due process. *Tucker*, 404 U.S. at 447; *United States v. Lanning*, 633 F.3d 469, 477 (6th Cir. 2011) (rejecting due process claim where the petitioner failed to point to specific inaccurate information relied upon by the court).

Finally, Petitioner argues that the sentencing judge violated his Sixth Amendment right to a trial by jury by using, to enhance his sentence, facts that had not been admitted by Petitioner or found by a jury beyond a reasonable doubt.  Petitioner bases his argument on the

United States Supreme Court holding in *Blakely*, 542 U.S. 296.  *Blakely* concerned the State of Washington's determinate sentencing system, which allowed a trial judge to elevate the maximum sentence permitted by law on the basis of facts not found by the jury but by the judge.  Applying the Washington mandatory sentencing guidelines, the trial judge found facts that increased the maximum sentence faced by the defendant.  The Supreme Court found that this scheme offended the Sixth Amendment, because any fact that increases or enhances a penalty for the crime beyond the prescribed statutory maximum for the offense must be submitted to the jury and proven beyond a reasonable doubt.  *Blakely,* 542 U.S. at 301 (citing *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).

Unlike the State of Washington's determinate sentencing system, the State of Michigan has an indeterminate sentencing system in which the defendant is given a sentence with a minimum and a maximum term.  The maximum sentence is not determined by the trial judge, but is set by law. *See People v. Drohan,* 715 N.W.2d 778, 789-91 (Mich. 2006) (citing Mich. Comp. Laws § 769.8).  Only the minimum sentence is based on the applicable sentencing guideline range. *Id.*; *and see People v. Babcock*, 666 N.W.2d 231, 236 n.7 (Mich. 2003) (citing Mich. Comp. Laws § 769.34(2)).  The Sixth Circuit authoritatively has held that the Michigan indeterminate sentencing system does not run afoul of *Blakely*.  *See Chontos v. Berghuis*, 585 F.3d 1000, 1002 (6th Cir. 2009) (affirming district court's dismissal of prisoner's claim under *Blakely v. Washington* because it does not apply to Michigan's indeterminate sentencing scheme); *Tironi v. Birkett*, 252 F. App'x 724, 725 (6th Cir. 2007).  Therefore, the state court's determination of Petitioner's claim was not contrary to federal law clearly established by the United States Supreme Court or an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

For all these reasons, the state court's rejection of the claims raised in Grounds VIII and IX of the petition were not based on an unreasonable determination of the facts and were neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. 28 U.S.C. § 2254(d).

VII.   Ineffective Assistance of Trial Counsel

Petitioner raises a variety of complaints about the effectiveness of his trial counsel In his third habeas argument, Petitioner contends that trial counsel was ineffective in failing to object to the jury instruction issue presented in Ground I of the petition and in failing to object to the prosecutorial misconduct issue raised in Ground II.  In his fourth ground for habeas relief, Petitioner contends that trial counsel was ineffective for failing to raise an insanity defense. Moreover, Petitioner contends that his attorney rendered ineffective assistance by failing to object to alleged trial court errors in Grounds VII, VIII, and IX.

In *Strickland*, 466 U.S. at 687-88, the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court

must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential.  *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 131 S. Ct. 733, 740 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.*

## A.      Grounds III, VII, VIII, and IX

In Ground III of his petition, Petitioner contends that his attorney rendered ineffective assistance by failing to lodge proper objections with respect to Grounds I and II, causing his claims to be deemed waived or abandoned by the Michigan Court of Appeals.  In Grounds VII, VIII and IX of his petition, Petitioner argues that trial counsel's failure to object to instructional errors and sentencing determinations, again causing his claims to be deemed procedurally waived and subject only to plain-error review.

In evaluating Petitioner's claims, however, I have not relied on any of his procedural defaults.  Instead, I have concluded that all of Petitioner's claims lack merit.  It therefore follows that any objection by defense counsel would have been futile.  It is well established that counsel's failure

to make a frivolous or meritless objection does not constitute ineffective assistance of counsel. *See, e.g., Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007); *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004).

### B.    Ground IV

In Ground IV of his petition, Petitioner argues that counsel was ineffective in failing to raise an insanity defense.  Petitioner raised the issue in the Michigan Court of Appeals as his first supplemental issue.  The court of appeals rejected the claim as follows:

> First, defendant claims that defense counsel rendered ineffective assistance of counsel by failing to raise an insanity defense.  This claim entirely lacks merit.  The record suggests that defendant's first appointed defense counsel sought to advance an insanity defense.  The trial court subsequently ordered defendant to undergo a psychiatric examination regarding his claim of insanity.  Defendant filed two *in propria persona* motions, which essentially opposed the prospective insanity defense.  Notably, defendant moved to set aside the psychiatric examination.  The trial court denied both motions.  A psychologist conducted an evaluation of defendant, and the trial court conducted a subsequent hearing.  The insanity defense was not addressed at the hearing, nor did the psychologist reference it in his report.  We find that the insanity defense was abandoned as a possible defense based on defendant's *in propria persona* motions and his representations in the psychologist's report.  We reject defendant's claim of ineffective assistance of counsel, where the record demonstrates that an insanity defense was considered, and ultimately rejected by defendant.  A defendant is not allowed to assign error to something he deemed proper below, "[t]o do so would allow a defendant to harbor error as an appellate parachute."  *People v Green*, 228 Mich App 684, 691; 580 NW2d 444 (1998).

(MCOA Op. at 3.)

The court of appeals based its decision on a finding that Petitioner had abandoned his insanity defense by filing motions contrary to that defense.  That determination by the court of appeals is a factual one, which is entitled to a presumption of correctness, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

Petitioner does not attempt to dispute the finding. Upon review of the factual record, defense counsel raised the insanity defense early in the case history. (*See* Tr. Ct. docket sheet at 3, docket #32.) On the motion of defense counsel, the trial court ordered both an evaluation relative to criminal responsibility and an order for a competency examination. (*Id.*, Tr. Ct. docket entry ##18, 19.) Petitioner, in a motion filed pro se, moved to set aside the forensic psychiatric evaluation, (*id.*, docket entry #20) and was denied by the court on March 19, 2008 (*id.*, docket entry #22.) The psychological evaluation was completed and filed on on June 27, 2008. (*Id.*, docket entry #29.) At a hearing held that same date, the court found Petitioner competent to stand trial. (6/27/08 Competency Exam. Tr. at 5, docket #35.) After the psychological evaluation, defense counsel stopped pursuing the insanity defense. Based on Petitioner's own motions, Petitioner himself elected not to pursue the defense.

Regardless of Petitioner's abandonment of the issue, however, he cannot demonstrate that counsel was ineffective in not pursuing the defense further. It is apparent from the record, and Petitioner does not dispute, that trial counsel met his duty to investigate the insanity defense by seeking and obtaining a psychological evaluation. *See Strickland*, 466 U.S. at 691 (holding that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"); *see also Wiggins v. Smith*, 539 U.S. 510, 524-29 (2003); *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). As a consequence, the attorney's decision not to pursue the defense clearly was strategic, and counsel is entitled to the "strong presumption" that strategic choice fell "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. At no time has Petitioner has offered evidence to overcome that presumption. He therefore fails to demonstrate that counsel was ineffective.

- 38 -

For both reasons, Petitioner fails to overcome the double deference owed to the state court's disposition of his fourth habeas ground.  *See Richter*, 131 S. Ct. at 788.

**Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Dated:  March 23, 2015                          /s/ Hugh W. Brenneman, Jr.
                                                HUGH W. BRENNEMAN, JR.
                                                United States Magistrate Judge

**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).